## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMANTHA MARIE CARROLL,**

      **Plaintiff,**

      **vs.**                                              **Civ. No. 22-464  JFR**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed September 27, 2022, in support of Plaintiff Samantha Marie Carroll's Complaint (Doc. 1) seeking review of the decision of Defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Defendant" or "Commissioner"), denying Plaintiff's claim for Title XVI supplemental security insurance benefits.  On November 28, 2022, Plaintiff filed her Motion to Reverse and Remand Administrative Agency Decision ("Motion").  Doc. 19.  The Commissioner filed a Response in opposition on February 23, 2023 (Doc. 23), and Plaintiff filed a Notice of Completion of Briefing on March 27, 2023 (Doc. 27).  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  Docs. 10, 11, 12.

## I.  Background and Procedural Record

Claimant Samantha Marie Carroll ("Ms. Carroll") was initially allowed Supplemental

Security Income benefits on July 28, 2009, due to seizures.[2]  Tr. 163.  In 2016, Ms. Carroll

underwent an Age 18 Disability Redetermination.  Tr. 168.  She alleged impairments of rheumatoid

arthritis, lower back pain, depression and anxiety.  Tr. 454.

On March 5, 2017, nonexamining State agency medical consultant William Harrison, M.D.,

reviewed the medical evidence record and assessed that Ms. Carroll was capable of light work

except that she should avoid even moderate exposure to hazards due to her history of seizure.[3] 864-

71.

On March 22, 2017, nonexamining State agency psychological consultant Kevin Santulli,

Ph.D., reviewed the medical evidence record.  Tr. 872-885.  Dr. Santulli prepared a Psychiatric

Review Technique and rated the degree of Ms. Carroll's mental impairments in the area of

understanding, remembering or applying information as *mild*; in the area of interacting with others

as *mild*; in the area of maintaining concentration, persistence and pace as *moderate*; and in the area

of adaptation or managing oneself as *moderate*.  *Id.*  Dr. Santulli also prepared a Mental Residual

Functional Capacity Assessment in which he found in Section I that Ms. Carroll was *moderately*

*limited* in her ability to (1) maintain attention and concentration for extended periods; (2) complete

a normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods; (3)

---

[2] The established onset date was February 1, 2009.  Tr. 163.  Ms. Carroll was 16 years old.  Tr. 456 (DOB – 06/12/1992).

[3] Light work involves lifting no more than 20 pounds at a time and 10 pounds frequently, and involves a good deal of walking or standing.  20 C.F.R. § 416.967(b).

respond appropriately to changes in the work setting; and (4) set realistic goals or make plans

independently of others.  Tr. 888-90.

In Section III, Dr. Santulli assessed that

clmt has mental health tx which indicates some situation stressors but mental status is
unremarkable.  Clmt remains functional and is capable of work where interpersonal
contact is routine but superficial, *e.g.,* grocery checker; complexity of tasks is learned
by experience, several variables, judgment within limits; supervision required is little
for routine but detailed for non-routine.  Semiskilled.

*Id.*

On March 22, 2017, the Administration issued a Cessation of Disability Determination.  Tr.

92.  On April 20, 2017, the Administration notified Ms. Carroll that it had reviewed her case and

had concluded she no longer qualified for SSI.  Tr. 136-37.  On May 4, 2017, Ms. Carroll requested

reconsideration.  Tr. 139.  On July 21, 2017, the Administration issued a second Cessation of

Disability.  Tr. 93.  Ms. Carroll appealed and a hearing was held on January 26, 2018.  Tr. 163.  The

hearing officer found that the assessments completed at the Age 18 Disability Redetermination

accurately reflected the severity and extent of Ms. Carroll's limitations, and that the totality of the

evidence supported the conclusion that she could sustain light level, unskilled work.  Tr. 168.  On

February 27, 2018, the Administration issued its third Cessation of Disability Determination.  Tr.

94, 180-92.

On October 9, 2018, Ms. Carroll requested a hearing before an Administrative Law Judge

("ALJ").[4]  Tr. 186.  On February 13, 2020, ALJ James Burke held a hearing which he ultimately

postponed based on Ms. Carroll's counsel's failure to appear.  Tr. 38-42.  On July 16, 2020, ALJ

Christopher Juge held a hearing telephonically.[5]  Tr. 43-63.  Ms. Carroll appeared, as did Attorney

---

[4] Good cause was found for Ms. Carroll's untimely request.  Tr. 190.

[5] The hearing was held telephonically due to the COVID-19 pandemic.  Tr. 45.

Jared Cook on her behalf.[6]  *Id.*  On September 4, 2020, ALJ Juge entered a partially favorable

decision, finding that

> claimant's disability ended on April 30, 2017, based on [her] age-18 redetermination
> because she did not satisfy the criteria for disability as an adult.  However, beginning
> December 4, 2019, the claimant became disabled again and has continued to be
> disabled through the date of this decision (20 CFR 416.987(e) and 416.920(c)).

Tr. 116.

On January 15, 2021, the Appeals Council *sua sponte* remanded the case to the ALJ and

directed that the ALJ will:

> Give further consideration to whether rheumatoid arthritis is a medically determinable
> impairment (20 CFR 416.921).  If necessary, determine whether rheumatoid arthritis
> has more than a minimal effect on the claimant's ability to perform basic work
> activities (Social Security Ruling 85-28).

> Further evaluate the claimant's mental impairment in accordance with the special
> technique described in 20 CFR 416.920a, documenting application of the technique in
> the decision by providing specific findings and appropriate rationale for each of the
> functional areas described in 20 CFR 416.920a(c).

> Give further consideration to the claimant's maximum residual functional capacity
> during the entire period at issue and provide rationale with specific references to
> evidence of record in support of assessed limitations (Social Security Ruling 96-8p).
> In so doing, evaluate the opinion evidence of record in accordance with the provisions
> of 20 CFR 416.927, and explain the weight given to such opinion evidence.

> Further evaluate the claimant's alleged symptoms and provide rationale in accordance
> with the disability regulations pertaining to evaluation of symptoms (20 CFR 416.929
> and Social Security Ruling 16-3p).

Tr. 129.

On May 11, 2021, ALJ Lillian Richter held an administrative hearing telephonically.  Tr.

64-91.  Ms. Carroll appeared, as did Attorney Sean Johnson on her behalf.  *Id.*  On December 21,

2021, ALJ Richter issued an unfavorable decision and found that Ms. Carroll was no longer

---

[6] Ms. Carroll is represented in these proceedings by Attorney Matthew McGarry.  Doc. 1.

disabled as of February 28, 2018.  Tr. 12-29.  On April 18, 2022, the Appeals Council issued its

decision denying Ms. Carroll's request for review and upholding ALJ Richter's final decision.  Tr.

1-6.  On June 20, 2022, Ms. Carroll timely filed a Complaint seeking judicial review of the

Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.    Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see*

*also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for

adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential

analysis to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[7] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must

---

[7] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a), 416.972(a).  Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.*  Gainful work activity is work activity that you do for pay or profit.  20 C.F.R. §§ 404.1572(b), 416.972(b).

determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.    Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at

800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor

substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th

Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence

. . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at

1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in

the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,*

966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a

sufficient basis to determine that appropriate legal principles have been followed." *Jensen v.*

*Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to

discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the

evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with

sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. <u>Analysis</u>

The ALJ made her decision that Ms. Carroll was no longer disabled as of February 28,

2018, at step five of the sequential evaluation. Tr. 28-29. The ALJ determined that Ms. Carroll

attained age 18 on June 11, 2010, and was eligible for supplemental security income benefits as a

child for the month preceding the month in which she attained age 18. Tr. 17. The ALJ noted that

Ms. Carroll was notified that she was found no longer disabled as of February 28, 2018, based on a

redetermination of disability under the rules for adults who file new applications. *Id.* The ALJ

determined that since February 28, 2018, Ms. Carroll had severe impairments of post-traumatic

stress disorder ("PTSD"), nonepileptic psychogenic seizure disorder, inflammatory polyarthritis,

rheumatoid arthritis, sicca syndrome and keratoconjunctivitis, degenerative disc disease of the

lumbar spine, lumbago with sciatica, trochanteric bursitis, and piriformis syndrome. Tr. 18. The

ALJ also determined that Ms. Carroll had nonsevere impairments of migraines, cannabis

dependence, bereavement, syncope, restless leg syndrome, eating disorder, h. pylori infection, and

gastroesophageal reflux disorder.  *Id.*  The ALJ determined that since February 28, 2018,

Ms. Carroll's impairments did not meet or equal in severity one of the listings described in

Appendix 1 of the regulations.  *Id.*  As a result, the ALJ proceeded to step four and found that since

February 28, 2018, Ms. Carroll had the residual functional capacity to perform light work as

defined in 20 CFR 416.967(b) except

> she can occasionally stoop, kneel, crouch, crawl, and balance; can never climb ladders, ropes, or scaffolds; and should avoid exposure to vibration, unprotected heights, hazardous machinery, and extreme cold.  The claimant can frequently reach bilaterally.  The claimant cannot operate a motor vehicle.  The claimant can perform detailed but not complex work; can remain on task for two hours at a time; can have occasional interaction with supervisors, coworkers, and members of the public; and can perform work in a workplace with no more than occasional changes in the routine work setting.

Tr. 20.  The ALJ concluded at step four that Ms. Carroll did not have any past relevant work.

Tr. 27.  The ALJ then determined at step five that based on Ms. Carroll's age, education, work

experience, RFC, and the testimony of the VE, there were jobs that existed in significant numbers

in the national economy that Ms. Carroll could perform, and that she was, therefore, not disabled.[8]

Tr. 28-29.

      In support of her Motion, Ms. Carroll argues that the ALJ's RFC determination is not

supported by substantial evidence and is the product of legal error because the ALJ failed to

properly consider the opinion evidence.  Doc. 19-1 at 10-19.

---

[8] The vocational expert testified that Ms. Carroll would be able to perform the requirements of representative occupations such as a Collator Operator, DOT #208.685-010, which is performed at the light exertional level with an SVP of 2 (44,000 jobs in national economy); a Merchandise Marker, DOT #209.587-034, which is performed at the light exertional level with an SVP of 2 (129,400 jobs in the national economy); and a Routing Clerk, DOT #222.687-022, which is performed at the light exertional level with an SVP of 2 (105,000 jobs in the national economy).  Tr. 28.

For the reasons discussed below, the Court finds that the RFC is not supported by substantial evidence because the ALJ failed to apply the correct legal standards when evaluating the medical opinion evidence.  This case, therefore, requires remand.

### A.     Legal Standards

#### 1.     RFC Assessment

Assessing a claimant's RFC is an administrative determination left solely to the Commissioner "based on the entire case record, including objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009); *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (an individual's RFC is an administrative finding).[9]  In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record.  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. §§ 404.1545(a)(2) and (3), 416.945(a)(2).  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at *7.   Further, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7).  When the ALJ fails to provide a narrative

---

[9] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017.  82 Fed. Reg. 5844, 5845, 5867, 5869.

discussion describing how the evidence supports each conclusion with citations to specific medical facts and nonmedical evidence, the court will conclude that the ALJ's RFC assessment is not supported by substantial evidence. *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003). The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003) (unpublished).

### 2.   Medical Opinion Evidence

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.[10] *See* 20 C.F.R. § 416.927(c); *see also Hamlin,* 365 F.3d at 1215 ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."). "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs*., 52 F.3d 288, 290 (10th Cir. 1995)).[11] An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion. *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007). However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). The ALJ's decision for according weight to medical opinions must be supported by substantial evidence. *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005). An

---

[10] The agency issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.). However, because this is an age 18 redetermination and Ms. Carroll attained age 18 prior to March 27, 2017, the previous regulations for evaluating opinion evidence apply to this matter. *See* 20 C.F.R. 416.927; HALLEX I-5-3-30.IV.B (Note 1).

[11] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6).

ALJ is required to give controlling weight to the opinion of a treating physician if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."  *Hamlin*, 365 F.3d at 1215.

Ultimately, the ALJ must give good reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" for the weight that she ultimately assigns the opinion.  *Langley*, 373 F.3d at 1119 (citation omitted).  Failure to do so constitutes legal error.  *See Kerwin v. Astrue*, 244 F. App'x. 880, 884 (10th Cir. 2007) (unpublished).  In addition, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted).  Instead, an ALJ "must ... explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7.  Further, the Commissioner may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision."  *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

## B.  Medical Opinion Evidence Regarding Ms. Carroll's Ability To Do Work-Related Physical Activities

### 1.  William Harrison, M.D.

On March 15, 2017, nonexamining State agency medical consultant William Harrison, M.D., prepared a Physical Residual Functional Capacity Assessment based on his review of the medical evidence record.  Tr. 864-71.  He indicated that Ms. Carroll had a primary diagnosis of

polyarthritis and a secondary diagnosis of seizures.  TR 864.  He assessed that Ms. Carroll had the

ability to do a full range of light work, except that she should avoid even moderate exposure to

hazards due to seizures.  TR 868.  Dr. Harrison explained his assessment as follows:

> Clmt carries a diagnosis of Szs or pseudoseizures.  It is well documented by several
> MSS of THC abuse[.]
>
> LBP:
> MRI Lspine 8/2016 disc protrusions at L4-[L5] and L5-S1 w/ stenosis or nerve
> impingement.  Clmt treated w/ PT and meds but clmt did not comply w/ either[.]  Also
> dx w/ inflammatory poly OA[.]  Xrays 8/15/2016.  CXR and hands wnl.  Xray pelvis
> shows bilateral ileal dside sclerosis of hips w/ any loss of joint space.  OV 12/2/16
> inflammatory poly arthritis w/o any signs of PE.
>
> ADLS:
> Takes cares of child, drives, goes out alone, shops.
>
> ASSESSMENT:  Considering all the available MER; Light RFC w/ Sz precautions.

Tr. 871

> ALJ Richter accorded significant weight to Dr. Harrison's opinion.  She explained that:

> Dr. Harrison is familiar with Social Security disability regulations and his opinion is
> supported by detailed explanation and consistent with the medical evidence at the time
> of his review.  However, more recent evidence does support additional postural and
> reaching limitations.  His assessment is consistent with evidence showing claimant is
> able to do household chores, is independent with activities of daily living, cares for
> her child, cooks, and drives [] but also has some limits from RA pain [].  His opinion
> is also consistent with the lack of much evidence of seizure activity and with
> Dr. Clarke's clinical findings.

Tr. 26.

### 2.    __Kathy Clarke, M.D.__

On September 14, 2021, Ms. Carroll presented to consultative examiner Kathy Clarke,

M.D., "for the purpose of providing information to the state disability office for their use in making

a determination of disability[.]"  Tr. 1308-15.  Ms. Carroll reported impairments of rheumatoid

arthritis, PTSD complicated by psychogenic nonepileptic pseudo seizures, depression, anxiety

disorder, and chronic low back pain. *Id.* Dr. Clarke took social, past medical, functional, and various health histories. *Id.* Claimant reported, *inter alia,* that she was able to walk a block on level ground; had difficulty standing for more than 5-15 minutes; difficulty lifting more than 0-5 pounds; and was able to drive a car, cook, or shop for no more than 5-15 minutes. *Id.* Dr. Clarke's physical exam included vital signs, maneuvers, ambulation, gait, hearing, speech, skin, HEENT, neck, lungs, cardiovascular, abdomen, spine and extremities and muscle function. *Id.* Dr. Clarke also completed a form designated to documenting specific joints and respective ranges of motion. *Id.*

Dr. Clarke noted on physical exam, *inter alia,* that Ms. Carroll was not able to walk on her toes due to pain in joints and weakness; was unable to squat; could perform tandem heel walking with mild difficulty; was unable to bend over and touch her toes due to pain and stiffness in back and hips; had difficulty getting up and out of the chair and getting on and off the exam table; ambulated without difficulty and with a normal gait. *Id.* Dr. Clarke also noted that Ms. Carroll had significantly decreased lumbar forward flexion, extension, lateral flexion and rotation; marked bilateral shoulder crepitus with decreased range of motion; effusion and tenderness in the proximal phalangeal and metacarpal joint spaces of both hands; and hyperflexion deformity in the distal phalanx joints of both hands. *Id.*

Dr. Clarke assessed as follows:

Based on the available medical history and objective clinical findings, this claimant has limitations. They are as follows: she has limitations in standing and is able to stand occasionally in an 8 hour workday. She has limitations in sitting and is able to sit frequently in an 8 hour workday. She has limitations in walking and is able to walk frequently in an 8 hour workday. She has a limited ability to bend or stoop. Moderate limitations due to rheumatoid arthritis affecting back. She has limited ability to reach, handle or grasp. Significant limitations due to RA affecting hands. She can only lift and carry less than 5 pounds on an occasional basis on the left side. She can only lift and carry less than 5 pounds on an occasional basis on the right side. She has limitations in mentation. Significant limitations due to psychiatric conditions.

*Id.*

ALJ Richter accorded Dr. Clarke's medical opinion minimal weight.  She explained that:

Dr. Clarke saw the claimant on one occasion, for a physical examination, and did not treat the claimant.  Dr. Clarke's opinion is somewhat vague, as she refers to a chart explaining the extent of some limitations, but not to others (CDR 32F/9).  Dr. Clarke's clinical findings do not fully support her opinion.  She opined claimant had limited ability to reach, handle, or grasp, but reported on examination grip strength and fine and gross manipulative skills were normal (CDR 32F/6).  She indicated claimant was able to stand only occasionally, which is not supported by her report that claimant ambulated without difficulty and without assistive device, with a normal gait (CDR 32F/4).  Moreover, she does not support her opinion limiting standing to occasionally, where walking was frequently.  Dr. Clarke's opinion is also inconsistent with other evidence.  X-rays of the bilateral feet and bilateral shoulders obtained in April 2021 revealed no acute or significant bony abnormalities (CDR 31F/4-43).  Examination by a neurologist in July 2019 showed normal gait with ability to perform Romberg and tandem gait (CDR 31F/2).  Examination by a PCP in June 2020 showed normal tone and motor strength, no joint abnormalities, and normal movement of all extremities (CDR 30F/5).  Examination by a rheumatologist in April 2021 showed normal range of motion and strength except for tenderness and synovitis in the second and third PIP bilaterally (CDR 31F/27).  Dr. Clarke's opinion is also inconsistent with the lack of ongoing treatment for rheumatoid arthritis prior to December 2020.  Moreover, the rheumatologist continued the claimant on hydroxychloroquine, which was recently started, and added methotrexate, with the expectation of improvement in symptoms (CDR 31F/27).  Dr. Clarke's opinion is also inconsistent with claimant's extensive daily activities, including working at Motel 6 as a housekeeper in 2019 (CDR 24F/6), working some extra babysitting jobs to cover her bills and making frequent trips between Silver City and Las Cruces to visit family (CDR 29F/17), and cleaning and cooking a lot (CDR 29F/17).

Tr. 26-27.

### C.      The ALJ's RFC Is Not Supported by Substantial Evidence Because the ALJ Erred in Her Evaluation of the Medical Opinion Evidence

Ms. Carroll argues that the RFC is not supported by substantial evidence because ALJ Richter erred in her evaluation of the opinion evidence.  Ms. Carroll argues that the ALJ's according minimal weight to Dr. Clarke's opinion based on her having seen Ms. Carroll only one time and not being a treating physician is flawed because (1) the ALJ accorded significant weight to Dr. Harrison's opinion based on his mere record review; and (2) ALJ failed to cite any authority for

14

dismissing Dr. Clarke's opinion on this basis.  Doc. 19-1 at 13.  Ms. Carroll argues the ALJ failed

to appreciate that Dr. Clarke's opinion was rendered four years after Dr. Harrison's and reflects

material changes in Ms. Carroll's medical status.  *Id.* at 14.  Ms. Carroll argues that the ALJ failed

to discuss Dr. Clarke's mental findings without explanation.  *Id.* at 15.   Ms. Carroll further argues

that the  ALJ improperly relied on Ms. Carroll's reports of certain activities of daily living to

discredit Dr. Clarke's opinion and failed to engage in any discussion how Ms. Carroll's activities of

daily living demonstrate she can perform work on a daily basis.  *Id.* at 17.

   In its Response, the Commissioner asserts that substantial evidence supports ALJ Richter's

RFC determination.  Doc. 23.  The Commissioner asserts that the ALJ properly relied on

Dr. Harrison's opinion and reasonably discounted Dr. Clarke's "outlier" opinion with legitimate

and valid explanations.  *Id.* at 13-19.  The Commissioner contends that Ms. Carroll's claim is an

improper request to reweigh the evidence.  *Id.*

   The ALJ erred in her evaluation of Dr. Clarke's opinion and her reasons for discounting it

are not supported by substantial evidence.[12]  The ALJ's first explanation for discounting Dr.

Clarke's opinion is that she saw Ms. Carroll on only one occasion and did not treat her.  Tr. 26.

The Commissioner asserts that discounting opinion evidence based on the lack of treatment is a

valid regulatory factor and that a consultative examiner is not presumptively entitled to more weight

than a reviewing physician.  Doc. 23 at 16-17.  The Commissioner further asserts that an examining

---

[12] Ms. Carroll specifically addresses some but not all the ALJ's explanations for discounting Dr. Clarke's opinion.  The Commissioner nonetheless contends that all of the ALJ's reasons are legitimate and valid.  The Court, therefore, addresses each of the ALJ's explanations for discounting Dr. Clarke's opinion.  A reviewing court may not "abdicate its traditional judicial function, nor escape its duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable, and whether the hearing examiner applied correct legal standards to the evidence."  *Womack v. Astrue*, 2008 WL 2486524, at *5 (D. Okla. June 19, 2008) (quoting *Bridges v. Gardner*, 368 F.2d 86, 90 (5th Cir. 1966)).  A court's duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable and whether the hearing examiner applied correct legal standards to the evidence is especially important because "unlike the typical judicial proceeding, a social security disability case is nonadversarial[.]"  *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).

relationship is only one of many factors to consider and that here the ALJ gave "half a dozen" valid reasons to reject Dr. Clarke's opinion. *Id.*

That Dr. Clarke examined Ms. Carroll only one time is "neither here nor there." *Florez v. Saul*, No. 19-cv-663 KK, 2020 WL 3607950, at *8 (D.N.M. July 2, 2020). "The frequency of examination is a relevant consideration in determining the weight to accord a *treating* source's opinions," but it plays little to no role in determining what weight to give to a consultative examiner's opinion. *Id.* (citing 20 C.F.R. § 404.1527(c)(2)(i) (providing that "the more times you have been seen *by a treating source*, the more weight we will give to the source's medical opinion")). Further, the Tenth Circuit has found that a limited relationship "is not by itself a basis for rejecting [the source's opinion]—otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012). Indeed, to discount an opinion based on a *one-time* examination is "particularly dubious" where, as here, the record contains no opinions rendered by a treating provider, and the ALJ essentially adopted the opinion of the *non-examining* state agency physician rendered four and half years earlier. *See Florez*, 2020 WL 3607950, at *8 n.10; *see also Robinson,* 366 F.3d at 1084 (explaining that generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all); *Jaramillo v. Colvin*, 576 F. App'x 870, 874 (10th Cir. 2014) (noting the significance of a recent physician's examination which found more limitations than an examination by another physician two years prior). And while the Commissioner is correct that in the face of other good reasons to reject an opinion it would not be error for the ALJ to remark that Ms. Carroll only saw Dr. Clarke one time, this is unhelpful in this

case because, as discussed below, the ALJ's other reasons for discounting Dr. Clarke's opinion are not supported by the evidence.

For example, the ALJ explains that Dr. Clarke's opinion was "somewhat vague" because Dr. Clarke refers to a chart explaining the extent of some limitations, but not others.  Tr. 26.  The Commissioner contends that the ALJ correctly determined that Dr. Clarke's opinion was vague because Dr. Clarke inconsistently applied functional limitation terms, *i.e.,* using occasionally and frequently to describe some functional limitations while using "limited ability" to describe others. *Id.*  Doc. 23 at 13.  The Commissioner, however, may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision." *Carpenter,* 537 F.3d at 1267.  That aside, the ALJ has failed to make clear to the Court how or why Dr. Clarke's use of and reliance on a chart that measures the range of motion for affected joints to assess certain limitations, which findings are consistent with Dr. Clarke's report findings under "Range of Motion" and correspond to Dr. Clarke's assessed limitations, *but not using or relying on a chart* to measure and assess Ms. Carroll's ability to stand, walk and sit renders the entirety of Dr. Clarke's assessed limitations "somewhat vague."  In short, this explanation is not sufficiently specific and is unclear. *See Langley,* 373 F.3d at 1119; *see generally Robinson*, 366 F.3d at 1082-83 (remanding for further proceedings because the ALJ did not explain why he found the opinion to be "vague and conclusive").

Next, the ALJ explains that Dr. Clarke's report and assessed limitations are internally inconsistent.  Tr. 27.  The ALJ takes issue with Dr. Clarke's findings on physical exam that Ms. Carroll's grip strength and fine and gross manipulative skills were normal yet Dr. Clarke assessed functional limitations in Ms. Carroll's ability to reach, handle or grasp.  The ALJ's explanation, however, fails to address Dr. Clarke's range of motion findings in Ms. Carroll's

shoulders and hands due to rheumatoid arthritis and resolve whether they could account for the functional limitations assessed, or in the alternative explain why not.  "An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Haga*, 482 F.3d at 1208.  Instead, an ALJ "must ... explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7.  The ALJ also takes issue with Dr. Clarke's findings on physical exam that Ms. Carroll had a normal gait and could ambulate without difficulty or assistance yet Dr. Clarke assessed Ms. Carroll had functional limitations in standing, walking and sitting.  Tr. 26-27.  The ALJ similarly fails to discuss Dr. Clarke's other observations and findings on physical exam, *i.e.,* that Ms. Carroll was not able to walk on her toes due to pain in joints and weakness; was unable to squat or bend over and touch her toes due to pain and stiffness in her back and hips; had mild difficulty getting up and out of the chair and on and off the exam table; and had significantly decreased lumbar forward flexion, extension, lateral flexion and rotation and resolve whether these findings could account for the functional limitations she assessed, or why not.  *Haga*, 482 F.3d at 1208.

The ALJ's next explanation is that Dr. Clarke's opinion is inconsistent with other evidence in the record, such as 2021 x-rays of Ms. Carroll's bilateral feet and shoulders that showed no acute or significant bony abnormalities; a 2019 neurology exam that showed normal gait with ability to perform Romberg and tandem gait; and a 2020 PCP exam showing normal tone and motor strength, no joint abnormalities, and normal movement of all extremities.  Tr. 27.  However, a review of the record demonstrates that ALJ Richter in similar fashion engaged in picking and choosing from among these records to support her finding, which she is not allowed to do.  For example, on April 29, 2021, Ms. Carroll presented to rheumatologist Maheswari Muruganandam, M.D., and

reported pain in multiple joints including shoulders, elbows, hands and feet, and that she continued to have swelling in her fingers every day with accompanying stiffness for 1-2 hours in the morning. T. 1289.  On physical exam, Dr. Muruganandam noted normal range of musculoskeletal motion and strength, and "tenderness and synovitis present in the second and third PIP bilaterally."  Tr.  1290. Dr. Muruganandam assessed seropositive rheumatoid arthritis and assessed moderate rheumatoid arthritis disease activity.  *Id.*  She specifically noted that Ms. Carroll had "active synovitis on today's exam."  *Id.*  On the same date, Ms. Carroll underwent radiologic studies of her feet and shoulders, which, as the ALJ accurately notes, indicate "no acute or bony abnormalities."  Tr. 1305-06.  However, the studies also indicate that "[i]f occult erosive bone changes or synovitis are clinically suspected MRI or ultrasound examination may be performed."  Tr. 1305.  In other words, the radiologic studies were insufficient to demonstrate active synovitis, the objective basis of Dr. Muruganandam's rheumatoid arthritis diagnosis and attributable source of Ms. Carroll's pain. Similarly, on July 25, 2019, Ms. Carroll presented to neurologist Annapoorna Bhat Ramachandra, M.D., for video EEG monitoring.  Tr.  1264-65.  The ALJ explains that Dr. Ramachandra noted normal gait with ability to perform Romberg and tandem gait; however, Dr. Ramachandra also noted on the same physical exam that "[s]trength maneuvers provoked diffuse pain in all her joints. She also has pain on palpation of her back and neck and shoulders," which the ALJ ignored.  Tr. 1265.

The ALJ next explains that Dr. Clarke's opinion is inconsistent with the "lack of ongoing treatment for rheumatoid arthritis prior to December 2020."  Tr. 27.  In its Response, the Commissioner repeats the ALJ's explanation, asserts its validity, and adds that Ms. Carroll's treatment prior to 2020 "was largely conservative, prescription medications, which does not support the level of limitations Dr. Clarke opined."  Doc. 23 at 15.  A review of the medical evidence record

demonstrates, however, that Ms. Carroll persisted in seeking confirmation of and treatment for rheumatoid arthritis from the date of her diagnosis in 2016 and that her efforts were largely thwarted by obstacles out of her control.[13]  *See generally* SSR 16-3p, 2017 WL 5180304, at *9 (offering guidance to adjudicators in their consideration of a claimant's failure to follow or obtain recommended treatment, specifically instructing them to take account of the reasons for that failure).  Moreover, the ALJ's additional explanation that Dr. Clarke's opinion is not supported by the medical record evidence because Ms. Carroll's rheumatoid arthritis was expected to improve with the medication therapy Dr. Muruganandam prescribed on April 29, 2021, amounts to mere speculation and is an improper basis for rejecting medical opinion evidence.  *See generally, McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (explaining that "an ALJ may not make

---

[13] Ms. Carroll was first diagnosed with positive ANA and rheumatoid factors during a hospital admission on February 22, 2016, through March 3, 2016.  Tr. 677.  On April 4, 2016, Ms. Carroll requested a referral to a rheumatologist.  Tr. 617.  Four months later, on August 15, 2016, Ms. Carroll presented to Arthur Snyder, M.D., of Arthritis and Osteoporosis Associates of New Mexico.  Tr. 634-36.  Dr. Snyder, however, was not persuaded that Ms. Carroll had rheumatoid arthritis and assessed, *inter alia*, trochanteric bursitis, back pain, and piriformis syndrome.  Tr. 635.  He noted that "perhaps some tissue around the hands are thick" which could be attributed to Raynaud's phenomena.  Tr. 636.  He planned to recheck Ms. Carroll's autoimmune markers.  *Id.*  On September 2, 2016, CFNP Kathleen Cathey assessed rheumatoid arthritis based on Ms. Carroll's clinical presentation and requested a rheumatologist consultation.  Tr. 608.  On September 30, 2016, Dr. Snyder prescribed sulfasalazine, an anti-rhematic drug.  Tr. 795.  On December 2, 2016, Dr. Snyder noted that "serology was fairly strong for rheumatoid arthritis with the positive CCP and rheumatoid factor."  Tr. 621.  He noted that Ms. Carroll had been on methotrexate for approximately six weeks after having discontinued sulfasalazine due to side effects.  *Id.*  Dr. Snyder increased Ms. Carroll's methotrexate dosage on this date.  Tr. 622.  On April 24, 2017, Ms. Carroll presented to Virginia Hernandez, M.D., and reported that she had not been taking any medication for rheumatoid arthritis and instead was medicating with THC.  Tr. 894.  Ms. Carroll requested a rheumatology referral for medication recommendation.  *Id.*  On June 21, 2018, Ms. Carroll presented to neurologist Jose Padin-Rosado for seizure evaluation.  Tr. 926-29.  Dr. Padin-Rosado assessed tenderness through Ms. Carroll's body attributable to rheumatoid arthritis or fibromyalgia.  Tr. 928.  He prescribed Gabapentin "to try and help with nerve pain."  *Id.*  On July 16, 2019, Ms. Carroll presented to CFNP Randi Murphy and reported that she discontinued sulfasalazine due to side effects and was discharged from Dr. Snyder's practice.  Tr. 1067.  On August 2, 2019, CFNP Murphy noted lab work revealed "significantly high rheumatoid factor."  Tr. 1075.  She also noted that UNM had declined Ms. Carroll's patient referral due to a long waitlist.  Tr. 1076.  CFNP Murphy noted that she made an alternate referral to Las Cruces Rheumatology.  Tr. 1076.  In the meantime, Ms. Carroll declined interim treatment.  *Id.*  On December 3, 2019, CFNP Murphy indicated that Las Cruces Rheumatology was not accepting new patients.  Tr. 1091.  On March 5, 2020, CFNP Murphy indicated again that Las Cruces Rheumatology was unable to see Ms. Carroll and that Ms. Carroll was seeking an alternate referral.  Tr. 1127.  On June 30, 2020, Ms. Carroll presented to Julia Fitzgerald, PA, seeking a treatment plan for rheumatoid arthritis.  Tr. 1258.  Ms. Carroll reported using medical cannabis for relief.  *Id.*  PA Fitzgerald made a rheumatology referral.  Tr. 1260.  Approximately six months later, on December 10, 2020, Ms. Carroll presented to UNM's Department of Rheumatology and saw Dr. Muruganandam for a consultation.  Tr. 1266-68.

speculative inferences from medical reports and may reject a treating physician's opinion outright

only on the basis of contradictory medical evidence and *not due to his or her own credibility*

*judgments, speculation or lay opinion."*) (emphasis in original) (citation omitted)).

Last, the ALJ improperly relies on Ms. Carroll's activities of daily living to discount

Dr. Clarke's opinion and support her RFC determination.  For example, the ALJ notes that

Ms. Carroll worked as a housekeeper at Motel 6 in 2019 and reported in 2020 that she did some

babysitting "to cover her bills."  Tr. 27.  The record, however, reveals that Ms. Carroll worked at

Motel 6 there for less than one month[14] and reported to her mental healthcare provider on only one

occasion that she was babysitting.[15]  Short-term, intermittent work projects are not equivalent to

gainful activity.  *Talbot v. Heckler,* 814 F.2d 1456, 1462 (10th Cir. 1987); *see also* 20 C.F.R. §

416.974(c) (explaining that unsuccessful work attempts ordinarily do not show that a claimant can

do substantial gainful activity).  The ALJ also notes that Ms. Carroll traveled from Silver City and

Las Cruces to visit her family and reported that she was cleaning and cooking a lot.[16]  But the Tenth

Circuit has held that an ALJ's reliance on sporadic and intermittent performance of daily activities

to establish that a claimant is capable of engaging in substantial gainful activity is insufficient when

a claimant's medical complaints are supported by substantial evidence.  *See generally Frey v.*

---

[14] On March 18, 2019, Ms. Carroll reported to LMSW Donna Caires that she recently started a job at Motel 6.  TR. 1050.  On April 10, 2019, Ms. Carroll reported to LMSW Caires that she had left the job at Motel 6.  Tr. 1039.  Ms. Carroll testified that she suffered a seizure while working at Motel 6 and never went back to work.  Tr. 77.

[15] The Administrative Record supports that Ms. Carroll first presented to Hidalgo Medical Services for mental healthcare services on September 14, 2016.  Tr. 812-16.  She presented four times in 2016, once in 2017, fifteen times in 2019, and thirteen times in 2020.  Tr. 800-16, 982-99, 959-1000, 1141-1254.  On June 25, 2020, Ms. Carroll reported to BA Silver Tabor that she was "working some extra babysitting jobs to cover her bills."  Tr. 1253.

[16] On August 25, 2020, BA Silver Tabor noted that a clinical social worker intended to make a home visit to Ms. Carroll's home to which Ms. Carroll responded she had been "cleaning and cooking a lot."  Tr. 1245.  Ms. Carroll testified that she had a friend living with her at the time who was assisting her with cleaning and cooking.  Tr. 81-82.  On her Function Reports, Ms. Carroll reported the ability to prepare simple meals and being able to do some laundry and simple clean up.  Tr. 470, 500.  Ms. Carroll also testified that she engages friends for help with household chores and with her son.  Tr. 78-82.

*Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) (finding that the ability to do minor house chores and drive for brief intervals does not undercut allegations of disabling pain); *see also Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983) (finding that sporadic performance of a few household tasks, working on cars, and driving on occasional recreational trips did not establish that a person was capable of engaging in substantial gainful activity).  Here, the medical evidence supports Ms. Carroll's history of pain producing physical impairments, and the ALJ has failed to demonstrate how Ms. Carroll's engaging in sporadic and limited daily activities undercuts Dr. Clarke's evaluation and assessment of Ms. Carroll's ability to engage in work-related physical activities.

For all of the foregoing reasons, the Court finds that the ALJ erred in her evaluation of Dr. Clarke's opinion evidence and that her reasons for discounting Dr. Clarke's opinion are not supported by substantial evidence.  The ALJ's RFC, therefore, is not supported by substantial evidence.

**D.    Remaining Issues**

The Court will not address Ms. Carroll's other claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

**IV.  Conclusion**

Ms. Carroll's Motion to Reverse or Remand Administrative Agency Decision (Doc. 19) is **GRANTED.**   The Commissioner's final decision is remanded for additional proceedings.

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge,**
**Presiding by Consent**